# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDER HALLMAN, JEREMY KRAVETZ, DANIEL GREENBERG, NATHANIEL BEE, AND ABHIJN GUTTA, individually and on behalf of others similarly situated, | Civil Action No.: 1:26-cv-00317 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| KALSHIEX LLC, KALSHI, INC., KALSHI KLEAR INC., KALSHI KLEAR LLC, and KALSHI TRADING LLC, | |
| Defendant. | |

Plaintiffs Alexander Hallman, Jeremy Kravetz, Daniel Greenberg, Nathaniel Bee, and Abhijn Gutta bring this action on behalf of themselves, and all others similarly situated, against defendants KalshiEx LLC, Kalshi Inc., Kalshi Klear LLC, Kalshi Klear Inc., and Kalshi Trading LLC (collectively, "Kalshi" or "Defendant") to recover billions in wagers from Defendant's unlawful operation of an illegal, unlicensed sports betting platform and related deceptive and misleading business practices. Plaintiffs allege facts regarding themselves based on personal knowledge, and all other facts based on information and belief, following an investigation by counsel.

## NATURE OF THE ACTION

1.      Defendant Kalshi operates an illegal and unlicensed sportsbook under the guise of a "prediction market" by offering illegal sports "events contracts." Plaintiffs seek to recover, on behalf of themselves and a Class of similarly situated individuals, their lost wagers, as well as costs and attorneys' fees.

2.      For decades, states have used their sovereign police powers to strictly regulate sports wagering as a matter of public health, safety, and welfare. Following the Supreme Court's decision in *Murphy v. NCAA*, 584 U.S. 453 (2018), which struck down a federal law related to sports gambling because it "was a limitation on state legislatures," certain states passed new laws prohibiting sportsbooks from operating within their borders. According to these states, the existence of either legal or illegal sportsbooks would be detrimental to public health and welfare.

3.      Meanwhile, in the wake of the Court's *Murphy* decision, other states moved to legalize and regulate sports betting. While revenue generation is a key driver of this movement, these states also recognize the potential for expansive social harms associated with legal sports betting. To address these concerns, these states universally implemented certain requirements to

ensure operators act transparently and protect consumers from known predatory and exploitative industry. By way of example, typical guardrails in states that have legalized sports betting include:

- **Responsible Gaming Protections**: Mandatory self-exclusion lists, deposit limits, and resources for those suffering from gambling addiction.

- **Integrity and Fairness**: Oversight to prevent match-fixing, insider betting, and unfair "house" advantages.

- **Financial Security**: Requirements that player funds be held in segregated accounts and that operators possess the liquidity to pay out winnings.

- **Advertising Restrictions**: Strict rules to prevent predatory marketing targeted at minors or vulnerable individuals.

4.       Since 2021, Defendant Kalshi has operated a website and mobile app prediction market platform that offers users the opportunity to speculate on peer-to-peer "event contracts" in the form of "yes-or-no" questions. Originally, these contracts focused on a specific event like whether the U.S. would fall into a recession this year (or other such economic indicators), the occurrence (or non-occurrence) of events in music and film, as well as presidential approval ratings and the passing of significant laws in Congress and Supreme Court rulings.

5.       Beginning in January 2025, in its quest for profits from gambling addicts, Kalshi ignored all state sports gambling restrictions and extended its platform offerings to include single-game sports outcomes and proposition bets disguised as "event contracts." At the same time, it marketed itself as the "First Nationwide Legal Sports Betting Platform" operating in all 50 states. Kalshi claims that these sports bets are not wagers but rather Designated Contract Markets ("DCMs") purportedly regulated by the Commodity Futures Trading Commission ("CFTC"), and therefore lawful nationwide. This is false. In substance and operation, Kalshi is—and continues to be—an illegal, unlicensed (or "shadow") sportsbook masquerading as a "prediction market." By

invoking federal commodities regulation as a pretext, Kalshi unlawfully offers sports wagers in states where sports betting is prohibited and avoids state licensure, taxation, and consumer-protection requirements in states where sports betting is legal.

6.      Kalshi's claim that its sportsbook is not sports betting but rather a prediction market is belied by: (1) its own public statements—prior to 2025, Kalshi acknowledged that sports futures contracts were illegal under CFTC and state laws; (2) its consumer-facing advertisements and marketing materials, which use distinct sports gambling phrases—like "moneyline" bets, "prop" bets, "over/under" bets, "odds" bets, and "parlays"—to refer to its platform offerings; and (3) its user-interface, which is functionally indistinguishable from the interface provided on regulated, established sportsbooks like DraftKings, FanDuel, and Caesars. Kalshi's shadow sportsbook and its deceptive and misleading marketing statements and interfaces, therefore, intend to, and do in fact, mislead its users into believing the sports betting is legal, safe, and regulated.

7.      Kalshi further deceives sports betting users on its platform by claiming that Kalshi is a neutral, peer-to-peer exchange where trades only occur between independent participants. But this is not true. In its sportsbook, Kalshi plays the role of "the house" by utilizing its own affiliate (Kalshi Trading LLC) as well as other interested affiliates, as market makers. Specifically, Kalshi (or one of its affiliates) buys the other side of the sports bet, and if the bettor loses, then Kalshi, not some other user, collects the proceeds, just like a traditional sportsbook. By capturing the "bid-ask spread" and leveraging structural advantages in data and execution, Kalshi is not a neutral middleman, as it deceptively represents to its users, but rather, it is a conflicted participant that gains financially when its users' lose their bets.

8.      Finally, Kalshi deceives sports betting users on its platform by ignoring well-established consumer protection provisions to encourage sports gambling on its platform. For example, Kalshi's platform encourages higher-risk groups (including, youth), to trade, rewards

impulsive engagement, exploits anticipation, and diminishes user perception of financial risk, presenting the platform as if a user is not participating in a highly addictive, and (in the case of Kalshi) illegal, behavior.

9.      Since Kalshi expanded into sports betting, the product has grown rapidly, outpacing all of its other offerings. For January to September of 2025, approximately 77 percent of Kalshi's trading volume was sports betting, generating an estimated $4.8 billion in trades. In recent months these numbers have compounded. In the last four months of 2025, sports bets accounted for an estimated 90% of trading volume, bringing in billions more in sports betting trades.

10.      Kalshi's conduct, as described throughout this Complaint, violates state gambling and consumer protection laws. Kalshi's unlawful deception, misrepresentations, and related illegal activity enable it to unjustly enrich itself to the detriment of Plaintiffs and the putative class. Accordingly, Plaintiffs, on behalf of themselves and the putative class, bring this lawsuit to recover billions in applicable damages, Kalshi's unjust enrichment, and costs and attorneys' fees, as well as any other relief provided by statute or that the Court may award.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over the subject-matter of this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"),  provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiffs allege that the total claims of individual members of the proposed Class (as defined herein) are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, at all times relevant to the Complaint, Defendants principal place of business is in the District. Defendants also transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

13.     This Court has personal jurisdiction over Defendant because, *inter alia*, Kalshi: (a) transacted business throughout the United States, including in this District; (b) offered sports bets to Plaintiffs and the classes throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; or (d) engaged in conduct that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

14.     The activities of Defendants, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

## **PARTIES**

**A. Plaintiffs.**

15.     Plaintiff Alexander Hallman is a natural person and citizen of the State of Colorado. Plaintiff Hallman has had a Kalshi account since on or around August 2025. Plaintiff Hallman has placed sports bets on Kalshi valued at over $25 in the last three months in both Colorado and Minnesota. Relying on Defendant's representations, including that sports betting on Kalshi was legal in all 50 states, Plaintiff Hallman wagered and lost thousands of dollars on sports bets. Plaintiff Hallman has a self-professed gambling problem. After viewing ads for Kalshi on social media and television, Plaintiff Hallman took steps to block Kalshi from serving him with additional ads, including by blocking Kalshi on the social media platform Instagram and muting Kalshi

accounts on X. Plaintiff Hallman was concerned that viewing these ads would result in him giving in to an uncontrollable urge to place sports bets on Kalshi. Despite his best efforts to block future Kalshi ads, he continued to receive said ads, including on Instagram and X. Plaintiff Hallman is continually injured by Kalshi's unlawful sportsbook and its failure to comply with state regulations.

16.    Plaintiff Jeremy Kravetz is a natural person and citizen of Tennessee. Plaintiff Kravetz has had a Kalshi account since on or around early 2025. Plaintiff Kravetz has placed sports bets executed by Kalshi valued at over $25 in the last three months in Tennessee. Plaintiff Kravetz viewed ads for Kalshi on social media and television, including a 2025 Superbowl ad claiming that sports bets on Kalshi are legal in all 50 states, including Tennessee. Plaintiff Kravetz has wagered or placed sports bets on Kalshi both directly and through its affiliation with the financial platform Robinhood. Relying on Defendant's representations, Plaintiff wagered and lost thousands of dollars on Kalshi. Plaintiff Kravetz only tried Kalshi under the belief that because it was not a sportsbook, it was a safer alternative to sports betting. Plaintiff Kravetz has a self-professed gambling problem and has self-excluded from all licensed legal sportsbooks in Tennessee. Plaintiff Kravetz is unable to similarly exclude himself from participating in Kalshi sports betting on Robinhood, and when betting on Kalshi (directly or through Robinhood) is not offered many of the precautions that legal, licensed sportsbooks are required by law to provide. Plaintiff Kravetz is continually injured by Kalshi's unlawful sportsbook and its failure to comply with state regulations.

17.    Plaintiff Daniel Greenberg is a natural person and citizen of Texas. Plaintiff Greenberg has had a Kalshi account since on or around November 2025. Plaintiff Greenberg has placed sports bets on Kalshi valued at over $25 in the last three months in Texas. Plaintiff Greenberg has placed sports bets on Kalshi both directly and through its affiliation with the

financial platform Robinhood. Plaintiff Greenberg viewed ads for Kalshi on social media and television, including those claiming that sports betting is legal in Texas. Relying on Defendant's representations, Plaintiff wagered and lost thousands of dollars on sports bets on Kalshi.

18.    Plaintiff Abhijn Gutta is a natural person and citizen of Georgia. Plaintiff Gutta has had a Kalshi account since December 2025. Plaintiff Gutta has placed sports bets on Kalshi valued at over $25 in the last three months in Georgia. Plaintiff has a self-professed gambling addiction. Plaintiff Gutta signed up for Kalshi believing that, because it was a peer-to-peer exchange, it would provide better chances at winning compared to a traditional sportsbook. Plaintiff Gutta viewed ads for Kalshi on social media and television, including those claiming that you can trade legally in all 50 states. Relying on Defendant's representations, Plaintiff wagered and lost thousands of dollars on Kalshi sports bets.

19.    Plaintiff Nathaniel Bee is a natural person and citizen of California. Plaintiff Bee has had a Kalshi account since on or about October 2024. Plaintiff Bee has placed sports bets on Kalshi valued at over $25 in the last three months in California. Plaintiff viewed ads for Kalshi on social media. Relying on Defendant's representations that sports betting is legal in California, Plaintiff wagered and lost money on Kalshi sports bets. Had Plaintiff known that Kalshi was operating an illegal sports betting operation he would have never used Kalshi to place sports bets.

**B. Defendants.**

20.    Defendant KalshiEX LLC is a Delaware corporation headquartered at 594 Broadway Rm 407, New York, New York 10012. Upon information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a commodities exchange. Together with other Kalshi entities, it operates a prediction market. Its overall trading volume for 2025 has been estimated at $22.8 billion.

21.     Defendant Kalshi, Inc. is a Delaware corporation with its principal place of business and headquarters at 594 Broadway Rm 407, New York, New York 10012. Upon information and belief, it is the parent company of all other Kalshi entities. Defendant markets and offers sports betting through its "prediction market" in New York and the throughout the United States.

22.     Defendant Kalshi Klear Inc. is a Delaware corporation headquartered at 594 Broadway Rm 407, New York, New York 10012. Upon information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a registered derivatives clearing organization. Together with other Kalshi entities, it operates a prediction market.

23.     Defendant Kalshi Klear LLC is a Delaware corporation headquartered at 594 Broadway Rm 407, New York, New York 10012. Upon information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a registered derivatives clearing organization. Together with other Kalshi entities, it operates a prediction market.

24.     Defendant Kalshi Trading LLC is a Delaware corporation headquartered at 594 Broadway Rm 407, New York, New York 10012. Upon information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a market maker for Kalshi's prediction market, buying and selling "event contracts" on the platform. Together with other Kalshi entities, it operates a prediction market.

## FACTUAL ALLEGATIONS

### I.     History of Sports Betting.

25.     Regulation of gambling and sportsbooks has been a cornerstone of U.S. public policy, rooted in the exercise of States' police power to protect the health, safety and welfare of its citizens. *See e.g.*, *Champion v. Ames*, 188 U.S. 321, 356 (1903).

26.     Following a series of scandals, corruption, and erosion of sports market integrity in the 20th century (due to the rise of criminal syndicates as the primary operators of sports gambling

schemes throughout the United States), Congress passed several statutes to strengthen States' police powers to regulate gambling within their own borders. *See e.g.*, 18 U.S.C. § 1084 (prohibiting the use of wire communications to transmit sports wagers across state lines with the stated purpose of helping state authorities fight organized crime by disrupting their sports gambling businesses); 18 U.S.C. § 1952 (prohibiting using the mail or any facility in interstate commerce to engage in unlawful activities, and again, focused on assisting state authorities with combatting organized crime's control of illegal gaming); 18 U.S.C. § 1953 (criminalizing the interstate or foreign transportation of gambling paraphernalia related to sporting events to further help state authorities combat illegal gaming).

27.    In 1978, Congress reaffirmed the widely held belief that "the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders" when it passed the Interstate Horseracing Act, 15 U.S.C. §§ 3001.

28.    Notably, the one exception to this measured approach was the Professional Amateur Sports Protection Act (PASPA), which the federal government passed in 1992, and which banned almost all states from sanctioning sports gambling. Testifying in favor of the bill were the commissioners of the National Football League, Major League Baseball, National Basketball League, and National Hockey League, as well as athletes, doctors, and religious leaders.

29.    The legislative history confirms that PASPA was passed, in part, to address the effects of sports gambling on the integrity of sports leagues, as well as to address the increasing risk of teenage gambling. Indeed, preventing societal ills, like addiction and financial ruin, was a major legislative concern (both then and now).

30.    In 2018, the Supreme Court overturned PASPA in *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453 (2018), finding it violated the anti-commandeering doctrine of the 10th Amendment. In striking down the law, Justice Samuel Alito, writing for the majority,

famously stated: "It is as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals." *Id.* at 474. Following this opinion, the power to regulate and determine sports gambling's legality was, once again, returned to the states.

31.     Following this decision, 38 states and the District of Columbia moved to legalize sportsbooks while simultaneously requiring industry players to adhere to certain pro-consumer guardrails to ensure those who gambled for entertainment within their borders would be protected from the industries' long-standing susceptibility to fraud, addiction, financial ruin and corruption. Numerous other states continue to outlaw sports gambling in all forms, based on the viewpoint that there is no regulation strong enough to combat the social ills of sports betting.

## II.    Sports Betting in New York.

32.     Kalshi's Membership Agreement and Rulebook designate that any disagreement between users and Kalshi will be governed by New York law.[1]

33.     New York is one of the 38 states that has legalized sportsbooks, subject to careful regulation and licensing under the New York Racing Pari-Mutual Wagering and Breeding Law ("PML"). Following *Murphy*, New York amended § 1367 of the PML to allow licensed companies to offer mobile sports betting, making sports betting lawful to individuals located within New York who bet on platforms operated and maintained by licensed companies.

34.     New York also amended § 1367 to require betting platforms to implement various restrictions to protect consumers. For example, among other things, sportsbooks in New York: cannot accept wagers from anyone under twenty-one; must follow responsible gaming rules promulgated by the commission, including "comprehensive employee trainings on responding to

---

[1] https://kalshi.com/regulatory/rulebook; https://kalshi.com/docs/kalshi-member-agreement.pdf.

circumstances in which individuals present signs of a gambling addiction and . . . assess, prevent, and address problem gaming by . . . users"; must refuse wagers from individuals on any self-exclusion list; and must "assist[] the commission in conducting investigations into unusual wagering activity, match fixing, and other conduct that corrupts a wagering outcome of a sporting event or events."[2]

35.      Unregulated sports betting of any kind—*e.g.*, betting on unlicensed sportsbooks—is prohibited in New York.

36.      The New York Gaming Commission also taxes sports wagering operator revenue at 51 percent with all funds providing aid to education to New York's public schools, except: $5 million annually to fund sports programs for underserved youths (administered by the NYS Office of Children and Family Services); and $6 million annually to fund problem gambling education and treatment (administered by the NYS Office of Addiction Services and Supports).

37.      In 2021, New York awarded licenses to 9 mobile gaming operators. Kalshi is not one of them; Kalshi does not have a license to operate a sportsbook or a mobile sportsbook in New York.

38.      Kalshi does not pay sports wagering taxes to the state gaming commission on bets made within the State of New York.

39.      Kalshi also does not comply with (or otherwise offer its users) the benefit of the comprehensive consumer protection provisions required of mobile sportsbook operators in the State of New York.

---

[2] PML § 1367; N.Y. Gen. Oblig. § 5-401.

**III.    Kalshi's Unlawful Sportsbook.**

40.    Kalshi was established in 2018 by Tarek Mansour and Luana Lopes Lara, two financial analysts, who "observed that many financial decisions were driven by predictions about future events. However, they noticed a gap in the market: there was no straightforward way for people to trade directly on event outcomes."[3] Indeed, "[e]xisting financial products typically relied on complex structures to approximate event exposure, which were often cumbersome and costly. Recognizing this inefficiency, Tarek and Luana were inspired to create a simpler, more direct exchange where people could trade on the outcome of specific events."[4]

41.    Kalshi operates its futures exchange and mobile sportsbook out of its New York headquarters.

42.    Kalshi claims to operate all its products as a peer-to-peer prediction market, facilitating the trading of contracts between users. As explained on Kalshi's website, the platform:

> Give[s] people the ability to trade based on their opinions about a specific yes-or-no question. For example, if you have student debt and are worried about relief not passing, you can purchase a contract and get a payout even if it doesn't pass. If you're worried about the economic fallout of the government shutting down, you can place a trade to hedge against it. If you've developed a model on inflation, you can profit from that . . . and maybe even offset your rising costs.

43.    Kalshi began offering event contracts in June 2021, in this binary yes-or-no format. Users receive a fixed payout if they correctly predict the occurrence of the specific event in question and receive nothing if they are wrong.

44.    Each contract's price (ranging from $0.01 to $0.99) would be determined based on total volume of "Yes" and "No" wagers, which creates real time fluctuations of the market's perceived probability of the event occurring. As the perceived likelihood of an event occurring

---

[3] https://kalshi.com/about.
[4] *Id.*

increases, the corresponding contract price increases. For example, if wagering on 100 "Yes" event contracts for a certain event to take place at a cost of 30 cents each ($30 total)—plus any applicable transaction fee—and the event in fact occurs, it would result in payout of $1 per contract, or $100 (netting $70). If incorrect, the original $30 is lost.



*Figure A: Image created using Gemini prompt*

45.     In January 2025, Kashi announced it was expanding its business model to offer "sports trading" on its platform. According to Kalshi, it could enable users to make sports bets on the outcome of various sporting events through a "legal sports market, accessible to Americans in all 50 states."

46.     Only five months later, by June 2025, Kalshi had about 2 million users in the United States. While Kalshi has not reported the number of users more recently, on a recent, single NFL Sunday (December 7, 2025), it was estimated that $329 million was "traded" on Kalshi, with 97% (or $318 million) of the bets having been placed in its sportsbook.



Kalshi monthly trading volume

■ Sports  ■ Other (including politics)

Note: September figures are through Thursday.
Source: Kalshi

*WSJ*

## A. Kalshi Deceives and Misleads Users by Operating an Unlicensed or Illegal Sportsbook in Violation of State Gaming Laws.

47.    Pursuant to CEA § 5c(c)(5)(C) and CFTC Rule 40.11(a)(1), registered entities, like Kalshi, are prohibited from offering "gaming" contracts, or any activity that is unlawful under any State or Federal law.

48.    Indeed, in litigation before the Commodity Future Trading Commission in 2024, related to Kalshi's efforts to offer election-based prediction market products, Kalshi acknowledged that the "gaming" contracts prohibited under the CFTC rules includes "sports betting," such as "contracts predicated on points spread and total points in NFL games."[5] Kalshi also emphasized that sports betting contracts is "*precisely* what Congress had in mind" when it prohibited registered entities from offering "gaming" contracts.[6]

---

[5] Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, *Kalshi LLC v. Commodity Futures Trading Commission*, No. 23-cv03527-JMC, 2024 WL 397419 at *23 (D.D.C.).
[6] *Id*. at *23.

49.     Likewise, on Thursday October 24, 2024, Chief Executive Officer and co-founder Tarek Mansour participated in a reddit discussion—under Kalshi's official reddit handle—regarding Kalshi's recent, successful lawsuit to legalize electing futures trading.



50.     In that conversation, Mr. Mansour explicitly acknowledged that Kalshi was successful in that litigation because it distinguished election futures from "gaming," or sports betting, which was "illegal on a federal level to bet on" as a futures contract.

> **K** **kalshi_official** **OP** • 1y ago
> Yes! Basically, elections used to be considered "gaming", making them fall into the same category as sports, and thus illegal on a federal level to bet on. We disagreed with this interpretation of the law, sued the CFTC over it, and won! There's a good WSJ piece on it here if you want more info.

51.     In another comment in that reddit conversation, which appears to have since been deleted, Mr. Mansour emphasized that "There are certain prediction scenarios that we will *never*

list . . . we also avoid anything that could be interpreted as 'gaming' (like sports), as that is
illegal under federal law."



52.     As such, Kalshi's leadership and top executives knew that it was illegal to offer
futures contracts that are tied to sports outcomes. Yet, months later, Kalshi entered the sportsbook
market and illegally began to offer sports bets in knowing violation of state laws.

53.     In doing so, Kalshi made false and misleading statements to users who signed up
for Kalshi's sportsbook, deceiving them into believing that Kalshi has "legalized sports betting"
and users could do so "in all 50 states."

54.     Other ads similarly focus on the legality of sports bets on Kalshi, with phrases like
"Sports Markets Made Legal," "Bet on Football Legally with Kalshi," "Breaking News: Sports
Betting in All 50 States Now Legal" and "Sports Betting Officially Legal in" Minnesota/Texas/
Florida, etc.

 

55.     Kalshi specifically targets states where sports betting is illegal in all forms, like Texas, Georgia, Minnesota and Florida, among others.

 

56.    Beyond advertising that Kalshi is a legal sportsbook nationwide (while knowing it was not), Kalshi also used (and continues to use) misleading and deceptive language in its advertising and marketing materials.

57.    Kalshi set up a user interface that is nearly identical to a traditional sportsbook and uses the same gambling centric language. All of this was focused on convincing users of the safety and security of betting on a lawful marketplace, which (again) Kalshi is not.

58.    For instance, both Kalshi and licensed sportsbooks offer sporting events for consumers to wager on, present the odds, and the cost of each wager. Both Kalshi and licensed sportsbooks offer very similar odds and payouts, as well as spread options.



*A portion of a screen capture of the Kalshi App on the left taken on Dec. 22, 2025, showing the odds of Denver winning at 87% and calculating a payout of 6.73 which on a $10 bet would amount to a payout of $67. On the right is a screengrab of BETMGM, showing the same Denver vs. Chiefs game with odds of -550 which represents a $65 payout if correct.*

59.    Moreover, even the language that Kalshi uses in its ads and user interface, mimics the language known to gamblers: such as "spread," "parlays," "moneyline," and "over/under."



*Kalshi Website screengrab featuring gambling terms "spread" "total" "props"*



*Kalshi Instagram advertisement for parlays*

60.     Like other lawful sportsbooks, Kalshi also offers sign-up bonuses and related enticements for new users, such as $10 free for new users or $10 for referrals.



*Screengrabs featuring new user promos.*

61.     Kalshi's website interface is further designed to look like any of its lawful sportsbook competitors like Caesars or DraftKings, creating familiarity for new Kalshi users who have gambled on other sites. Kalshi also offers "sports mode" which converts the user interface to display spreads, money lines and totals, and looks exactly like legal sportsbooks.



*Image from Kalshi*                          *Image from Caesars*

62.     These advertisements, marketing materials, and user interfaces are deceptive and misleading to Kalshi users because Kalshi is an unlicensed sportsbook that operates illegally in all 50 states—either by operating in a state without a sportsbook license or by operating in a state where sportsbooks are illegal.

63.     While contending in the press and in regulatory filings that its products are not sports gambling, its advertising, marketing materials, and user interface make clear that its product offerings are no different than those offered by sportsbooks. Users are thereby deceived by Kalshi's unlawful conduct into placing unlawful wagers.

**B. Kalshi Misrepresents its Position as "the House."**

64.     Kalshi founder Lopes Lara has claimed that Kalshi's offerings are "very different" from the sportsbook "model." Indeed, a critical difference emphasized by Kalshi publicly is that

when using its platform, "users are not going up against the house but instead trading contracts with other users on the opposite side of the proposition. While bookmakers charge a vig[7] on losing wagers, Kalshi makes its money from a transaction fee, similar to a broker, and has no stake in the result."

65.     This sentiment has been echoed by CEO and co-founder Tarek Mansour: "The first big difference is that we're a free market, not a book. We don't set the odds, we open a market and let people trade on it, and where the market settles is what the odds are. This is important because it means we're not profiting off of people from vig."

66.     Sara Slane, head of corporate development at Kalshi, has stated "As far as the product is concerned, we are not the house . . . We are simply an exchange. So we sit between people that are buying contracts on a yes and a no side. We don't win by people losing. And we don't lose by people winning. We simply sit in between that transaction."

67.     Yet, in reality, there is very little difference between how the "House" operates a lawful sportsbook, and how Kalshi operates. For example, like sportsbooks, Kalshi or its affiliates or partners match the opposite side of sports bets (the "yes" and the "no"), so that the combined investment will equal $1.  Kalshi does this, purportedly, to ensure there is sufficient liquidity for its users to place bets and receive payouts. But, in reality, Kalshi does this to profit from the betting the way "the House" does in a traditional sportsbook. For example, if a bettor wants to place a "No" bet and there are not enough bettors on the opposite "Yes" side, Kalshi (or one of its affiliates) steps in and buys the "Yes" shares. In doing so, users are no longer trading against "the crowd." Indeed, once the market maker steps in "to ensure liquidity," if the user loses, the market maker keeps the money. Thus, Kalshi's market makers act as the "House," unbeknownst to users.

---

[7] A "vig" is short for a "vigorish" or the percentage deducted from a gambler's winnings by the organizers of a game. It is also sometimes referred to as the "juice."

68.    Additionally, while Kalshi may not charge a vig, it profits through the spread (the buy/sell difference). Kalshi market makers get paid a premium for providing constant liquidity. This is particularly true for bets that Kalshi calls "combos," which are no different from a sportsbook "parlay." These types of bets are a "cash cow" for gambling companies, and due to liquidity issues, can only be offered on Kalshi if there is a market maker willing to take the other side of the bet. Since Kalshi uses its own affiliates and partners as market makers, it benefits from these bets just like any sportsbook. Restated, despite Kalshi's attempts to differentiate itself from traditional sportsbooks, it is evident that its business model is identical to that of a sportsbook where it benefits as the "House" and receives hidden advantages not offered to users.

69.    Experts have criticized Kalshi's model, noting that the involvement of Kalshi (or its affiliates) as market makers means that "Kalshi [operates] more like traditional sportsbooks than advertised." Darthmouth Professor of Economics Eric Zitewitz explained that that institutional market makers are more like sportsbooks than retailers, who have advanced data models driving decisions, and as a result the system is "unfair" if users don't know what they are getting into.

70.    Indeed, by some estimates, playing its version of the "House" allows Kashi to extract more money from users compared to the traditional sportsbook. Kalshi charges a standard transaction fee for most wagers, and charges more for events where the outcome is more uncertain. Thus, the transaction fees Kalshi charges are based on the contract's "expected earnings." This fee structure, and the "spread" maintained by Kalshi (or the affiliated market maker), result in a mathematical edge for the platform that is functionally indistinguishable from a sportsbook's profit margin.

71.    Moreover, while Kalshi's advertisements lull users into the false belief that, as a peer-to-peer market, Kalshi offers users greater odds of success and lower fees compared to other

sportsbooks, but research shows that is not true. In fact, Kalshi is overall more expensive compared to a legal sportsbook. An analysis from pregame money lines and totals on Friday, September 5, 2025 demonstrated that the "pricing on Kalshi for the money line and over/under was 10% and 25% more expensive compared to DraftKings for the NFL slate on Friday and 16% and 23% more expensive compared to FanDuel, respectively." By Sunday, September 7, 2025, the same analysis demonstrated that while "pricing tightened between the traditional sportsbooks and Kalshi, [ ] the average of the money line was still 7% more expensive compared to FanDuel/DraftKings, with over/under 10% more expensive."

72.    Thus, despite public statements in opposite, Kalshi (directly or through its affiliates) assumes the role of the "House" in a traditional gambling operation.[8] Kalshi does not disclose the true nature of its (and the market makers') role. Rather, Kalshi perpetuates consumers' misperceptions and capitalizes on it.

C. **Kalshi Operates its Sportsbook in a Deceptive and Unlawful Way Because its Lacks Critical User Safeguards Yet It Encourages Impulsive Engagement, Exploits and Rewards Anticipation, and Diminishes User Perception of Financial Risk.**

73.    State gambling licenses and enforcement are crucial to consumer welfare because sports gambling, just as any other gambling, is highly addictive, and consumers are particularly vulnerable to a sportsbook's misleading or unlawful conduct. Gambling presents serious risk; the rate of suicide by gamblers is an estimated 15 times higher than the overall population, online gambling is associated with cardiovascular disease, hypertension, peptic ulcer disease and loss of sleep, and research suggests a link between gambling and disease, including dementia and

---

[8] Another Kalshi affiliate, Kalshi Klear LLC, which functions as an internal body of its corporate structure, acts as its clearinghouse. It finalizes and settles event contract wagers. It also determines outcomes and issues payouts once an event has ended. With the help of Kalshi Trading LLC and Kalshi Klear LLC, the Defendant operates a closed-loop system in which it creates games, handles bets and pays out the winners.

Parkinson's, and the financial losses inflicted by gambling exceed $115 billion annually in the U.S. today.

74.     Indeed, it is widely recognized that gambling addictions may be severe, and protection is required for those with access to sports betting. Gambling stimulates the brain's reward system and leads individuals to participate in risky behavior and risk a multitude of assets in hopes of gaining the "high" of a bet paying out. Sports betting has also become extremely popular with young people, who are at greater risk of developing a gambling addiction if they begin betting at an early age since their brain is not fully developed. The harms affect a large swath of American consumers. It is estimated that more than 2.5 million adults meet the criteria for a sever gambling problem in a given year, while another 5 to 8 million experience "mild or moderate" problems. Following the legalization of sports betting in certain states, the gambling industry itself has exploded with an increase in revenue of 2,650% from 2018 to 2023. This rise of gambling in the general population, can lead to an increase in the number of individuals with problematic gambling behaviors.

75.     Additionally, scholarship has found that people with a gambling addiction report that gambling advertising causes them to gamble more and is associated with problem gambling and higher gambling frequency.

76.     Meanwhile, legalized gambling has robust consumer protection requirements to ensure sportsbooks cannot take advantage of gambling addiction through impulsive engagement, exploitation and reward anticipation, and diminished user perception of financial risk (such as by presenting the platform as if a user is not participating in a highly addictive, and (in the case of Kalshi) illegal, behavior). As the Head of the NFL noted, in state-licensed sports betting, regulators monitor betting activity but "those guardrails do not exist in prediction markets."

77.    Kalshi has advertised that its product is "kind of addicting." Yet, Kalshi does not even attempt to comply with the consumer protection provisions in New York (or other states) gambling laws. While Kalshi pays lip service to the "numerous risks associated with trading on Kalshi" in its membership agreement and in one place on its website homepage (that requires scrolling), no other such disclaimers exist anywhere on its public-facing wager pages or advertisements. Comparatively, lawful sportsbooks must include a 1-800-gambler message on every screen and advertisement.

78.    Beyond that, Kalshi's limited user protection features are woefully ineffective and fail to match the minimum protections required by legalized and licensed sports betting sites. The only measures implemented by Kalshi are localized (to Kalshi) "trading breaks", voluntary "opt-outs" and "personalized funding caps."

79.    Meanwhile, by way of example, New York maintains a robust, legally binding self-exclusion list (*e.g.*, a "blacklist") that sportsbooks must adhere to by refusing wagers from, anyone on *any* self-exclusion list. Likewise, while New York law requires operators to allow users to permanently close an account,[9] Kalshi offers only the option of temporarily deactivating.

80.    Many states also require sportsbooks to have hard daily, weekly, and monthly deposit limits to ensure a users' gambling does not get out of control (these numbers vary by state). For instance, New York gaming law permits credit card deposits but limits bettors to $2,500 per year per credit card absent a user acknowledging they have met the deposit limit, that they have access to resources and can set responsible gaming limits.[10] Meanwhile, Kalshi allows *daily* deposits by credit card or bank of $2,500 and crypto of up to $500,000, setting an excessively high and dangerous deposit ceiling. Furthermore, Kalshi, through its partnership with Robinhood, offers

---

[9] New York PML §1367-A(4)(a).
[10] New York PML §1367-A(4)(a) and (5)(b).

futures prediction markets on Robinhood's app which integrates user's access to investment capital and allows users to liquidate assets to trade sports "event contracts."

81.     Another way Kalshi fails to protect consumers is by allowing anyone over the age of 18 to place bets on its platform. Notably, New York (and other states that have regulated sportsbooks) require sports gamblers to be, at a minimum, 21 to place a bet. New York also prohibits sports wagering ads on college or university campuses.[11] Research confirms that younger people, in particular younger males, are more vulnerable to developing gambling addictions. Rather than try to protect such individuals, as recommended by the American Gaming Association, Kalshi prioritizes profits by targeting those most vulnerable to gambling addiction.

82.     There is no evidence that Kalshi follows other responsible gaming rules promulgated by state commissions, including for example New York's requirements that gaming operators provide "comprehensive employee trainings on responding to circumstances in which individuals present signs of a gambling addiction and . . . assess, prevent, and address problem gaming by . . . users."[12]

83.     Nor is there any evidence that Kalshi works with state gaming commissions to "assist[] the commission in conducting investigations into unusual wagering activity, match fixing, and other conduct that corrupts a wagering outcome of a sporting event or events."[13]

84.     This makes Kalshi particularly ripe as a market for manipulation, to the detriment of users. But Kalshi does not care. For example, due to the higher risk of manipulation and malfeasance in college sports, New York law prohibits sports betting in New York on New York college sports teams. Yet, those exact wagers may be found on Kalshi.[14] That is one reason why

---

[11] 9 N.Y.C.R.R. § 5329.37.
[12] PML § 1367 (14).
[13] PML § 1367 (12)(a).
[14] For example, on legal sportsbooks you may not bet on St. John's men's basketball, however on Kalshi such an option is available.

the NCAA has expressed that it vehemently opposes college sports prediction markets, citing that Kalshi is an "unregulated marketplace that does not follow any rules of legitimate sports betting operators."

85.     On top of this, Kalshi offers interactive features, designed to keep users engaged and online, thereby placing more bets and making those individuals more susceptible to gambling addiction issues. It also uses the same green colors drawn from psychology to signal safety and emphasizes profits and displays odds and costs in standard black text to diminish their prominence.

86.     Indeed, Kalshi has been particularly innovative in this respect, further gamifying gambling by, for example, introducing a ticker that continuously updates market activity and shows what "people are also buying" and displays what "people also bought" after a user makes a sports wager.



*Screen capture of Kalshi website on 12.23.25 displaying the "people are also buying" and showing the Ideas and Activity feed*

87.    These features exploit psychological triggers to increase profitability by enticing frequent transactions and playtimes through feelings of fun. It is well established that these types of practices have been criticized for using techniques that encourage disordered consumption, restrict consumer choice, and are lacking in both transparency and consumer safeguards.

88.    Another way that Kalshi has sought to take advantage of gambling addicts is to intentionally conflate their gambling scheme with traditional investments by representing that their events contracts are financial products, rather than a betting platform meant for entertainment. While traditional sportsbooks are prohibited by law from advertising as financial tools,[15] Kalshi markets itself as a financial tool, one that is safe and can help pay rent, less prone to losses due to its peer-to-peer structure, and skill-based. Several of the Kalshi slogans, for example, "everyone can win," "everyone is an expert at something," or "trade on what you know," create the false impression that placing sport bets is not gambling, but making use of a skill-based financial tool.

89.    In truth, much like traditional sportsbooks, users lose on Kalshi most of the time and its predictions are more chance-based than skill-based. Research has shown that activities perceived as skill-based create greater risk of dangerous behavior.

---

[15] 9 NYCRR § 5325.6. Advertising.



*Kalshi TikTok Ad Portraying Kalshi as a Financial Tool*

90.    Kalshi has also extended its platform to other investment-focused platforms. For example, users can now access Kalshi's sportsbook through the Robinhood app. This is problematic for several reasons.

91.    First, scholars have documented how trading platforms like Robinhood incorporate design features that mimic traditional gambling mechanisms meant to trigger dopamine releases and encourage compulsive trading. These gamified features expose retail investors and gamblers, especially those with lower financial literacy, to the risks of both gambling and excessive trading.

92.    Second, because both Kalshi and Robinhood operate in the same app, and without any of the typical safeguards and self-exclusion procedures typically found from licensed sportsbooks, consumers have access to large amounts of money, including potentially retirement funds, and can easily liquidate those investments to place more bets. As a result of having bets and financial investment tools in one combined application, the dangers inherent in gambling increase significantly, and consumers may risk their long-term financial health.

93.     Notably, traditional sportsbooks are subject to strict state regulatory frameworks that would prevent such a partnership.[16] Though Kalshi calls its sports bets "predictions," this whitewashing of language does nothing to mitigate the risks inherent in its business model. Kalshi, by infusing its platform with the characteristics of gambling, exposes its users to volatility and manipulation previously associated with gambling, and recognized as a public health risk.

94.     Finally, by failing to register as a licensed sportsbook, Kalshi avoids paying taxes collected by state gaming commissions. These taxes often fund multiple community welfare causes, such as the Council on Problem Gambling, which monitors gambling addictions on mobile platforms, helps raise awareness on the rise of problem gambling, and provides referrals and resources to those in need of addiction services.

95.     Kalshi deceives and harms users by marketing its platform and legal and safe, when it fails to protect consumers from known harms of sports gambling.

## CLASS ALLEGATIONS

96.     As detailed below, Plaintiffs bring this lawsuit on behalf of themselves and all other similarly situated, pursuant to rules Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

97.     Plaintiffs seek to represent Nationwide and, in the alternative, Statewide Sub-Classes (Collectively, "the Classes"), defined as:

> **Nationwide Class**: All persons in the United States who placed a wager on a sporting event on Kalshi (the "Nationwide Class").

> **Georgia Class:** All persons in the United States who placed a wager on a sporting event on Kalshi (the "Georgia Class").

---

[16] PML § 1367 (General Ads) and 9 NYCRR § 5329.34 (Responsible Gambling) create strict barriers designed to prevent users from viewing gambling as a financial tool.

**Tennessee Class:** All persons in the United States who placed a wager on a sporting event on Kalshi (the "Tennessee Class").

**California Class:** All persons in the United States who placed a wager on a sporting event on Kalshi (the "California Class").

**Minnesota Class:** All persons in the United States who placed a wager on a sporting event on Kalshi (the "Minnesota Class").

98.     Excluded from the Classes are Defendants, Defendant's subsidiaries, parents, successors, predecessors, and their officers, directors, affiliates, legal representatives, and employees, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

99.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.

100.    At this time, Plaintiffs do not know the exact number of members of the Classes; however, upon information and belief Plaintiffs estimate this number to be in the hundreds of thousands, at least, and therefore, that members of the Classes are so numerous that joinder of all members is impracticable. Members of the Classes can be easily identified through Defendant's records, discovery and self-identification.

101.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual class members include:

    a.    Whether Kalshi's sports markets are unlawful under section 1400-12 of New York Racing, Pari-Mutuel Wagering and Breeding Law and other state consumer protection and gambling laws;

b.    Whether Defendant's conduct was unfair, deceptive, and/or misleading under applicable law;

c.    Whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon Defendant by Plaintiffs and the Classes;

d.    Whether Plaintiffs and the Classes have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages;

102.    Plaintiffs' claims are typical of those of the Classes because Plaintiffs, like all members of the Classes, have sustained damages arising from Defendant's wrongful conduct.

103.    Plaintiffs will fairly and adequately protect the interests of the Classes and have retained counsel that is experienced in litigating complex consumer protection class actions. Plaintiffs' counsel has the financial and legal resources to vigorously prosecute this action. Plaintiffs have no interests which conflict with those of the Classes.

104.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The harm suffered by individual class members is likely small compared to the burden of litigating this matter to redress the harms caused by Defendant's wrongful conduct. The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate equitable relief with respect to the Classes as a whole. The interests of justice would be well served by resolving the common disputes of potential Class members in one forum. A class action provides economies of scale and of time, effort and expense. This action is manageable as a class action.

105.    The prosecution of separate actions by members of the Classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant.  For

example, one court might enjoin Defendant from performing the challenged acts, whereas another might not.  Additionally, individual actions could be dispositive of the interests of the Classes even where certain Class Members are not parties to such actions.

## CLAIMS FOR RELIEF

### COUNT I
### N.Y. GEN. OBLIG. LAW § 5-419
**(Plaintiffs Against All Defendants)**

106.    Plaintiffs repeat and re-allege all allegations in the foregoing paragraphs 1 to 95 as if fully set forth herein.

107.    Plaintiffs assert Count I on behalf of the Nationwide Class against all Defendants.

108.    Defendant's Member Agreement and Rulebook specify that any action brought against Kalshi by any participant (*e.g.*, user) is governed by New York law "without regard to statutes, precedent, legal doctrine, or contractual provisions that would require the application of the laws of a different jurisdiction."

109.    New York General Obligations Law §5-419 provides:

> Any person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not.

110.    Defendants operated an unlawful sports betting enterprise in the State of New York.

111.    This unlawful enterprise included the operation of a platform that enabled users to engage in illegal sports betting or wagering.

112.    Plaintiffs, relying on Defendants' representations, deposited funds into online accounts owned and controlled by Defendants for the purpose of participating in what was represented as lawful sports betting and/or wagering.

113.    Defendants processed these online payments in New York.

114.    Pursuant to New York General Obligations Law § 5-419, Plaintiffs and the Class are entitled to recover from Defendants all funds deposited in connection with Defendants' unlawful sports betting and/or wagering enterprise.

115.    Accordingly, Plaintiffs and the Class seek all damages, restitution, attorneys' fees, costs of suit and/or injunctive relief.

## COUNT II
### N.Y. GEN. OBLIG. LAW § 5-421
#### (Plaintiffs Against All Defendants)

116.    Plaintiffs repeat and re-allege all allegations in the foregoing paragraphs 1 to 95 as if fully set forth herein.

117.    Plaintiffs assert Count II on behalf of the Nationwide Class against all Defendants.

118.    Defendant's Member Agreement and Rulebook specify that any action brought against Kalshi by any participant (*e.g.*, user) is governed by New York law "without regard to statutes, precedent, legal doctrine, or contractual provisions that would require the application of the laws of a different jurisdiction."

119.    New York General Obligations Law §5-421 provides:

> Every person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof.

120.    Defendants operated an unlawful sports betting enterprise in the State of New York.

121.    This unlawful enterprise included the operation of a platform that enabled users to engage in illegal sports betting or wagering.

122.    Plaintiffs, relying on Defendants' representations, within the last three months, Plaintiffs deposited at least twenty-five dollars into online accounts owned and controlled by Defendants for the purpose of participating in what was represented as lawful sports betting and/or wagering.

123.    Defendants processed these online payments in New York.

124.    Plaintiffs lost the money they deposited by engaging in Defendant's unlawful betting and/or wagering games.

125.    Pursuant to New York General Obligations Law § 5-421, Plaintiffs and the Nationwide Class are entitled to recover from Defendants all funds lost in connection with Defendants' unlawful sports betting and/or wagering enterprise.

126.    Accordingly, Plaintiffs and the Class seek all damages, restitution, attorneys' fees, costs of suit and/or injunctive relief.

## COUNT III
### N.Y. GEN. BUS. LAW § 349
### (Plaintiffs Against All Defendants)

127.    Plaintiffs repeat and re-allege all allegations in the foregoing paragraphs 1 to 95 as if fully set forth herein.

128.    Plaintiffs assert Count III on behalf of the Nationwide Class against all Defendants.

129.    Defendant's Member Agreement and Rulebook specify that any action brought against Kalshi by any participant (*e.g.*, user) is governed by New York law "without regard to statutes, precedent, legal doctrine, or contractual provisions that would require the application of the laws of a different jurisdiction."

130.    New York General Business Law (N.Y. GBL) §349 provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

131.    New York General Business Law § 349 applies because Defendant engages in consumer-oriented conduct by, *inter alia*:

        a.    hosting an online platform wherein consumers pay to participate in illegal wagering and betting;

        b.    employing individuals in furtherance of its business;

        c.    soliciting individuals to become consumers of its product; and

        d.    receiving consumers' money in furtherance of its business.

132.    Defendant violated § 349 by, *inter alia*, misrepresenting the sports betting they offer as "legal sports betting," when it is unlicensed, by misrepresenting its products as "prediction markets" when it is addictive and dangerous gambling, and by misrepresenting its products as "peer-to-peer" when consumers are actually betting against Kalshi's internal market makers and partners.

133.    Defendant's conduct was material because it was likely to deceive reasonable consumers about the legality of placing their bets (*i.e.*, the lawfulness of its businesses and services), that it does not operate as the House, and whether they were operating a safe and regulated exchange with sufficient safeguards in place to protect users susceptible to engaging in an addictive behavior.

134.    Defendant willfully misled Plaintiffs and Nationwide Class and induced them to rely on their misleading statements and/or omissions.

135.    Defendant accepted money from Plaintiffs and the Nationwide Class to participate in unlawful wagering or betting.

136.    Accordingly, Plaintiffs and the Nationwide Class acted reasonably in relying on Defendant's misleading statements and/or omissions, the truth of which they could not have discovered through reasonable investigation.

137.    Defendant acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiffs' and the Nationwide Class Members' rights.

138.    As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiffs and the Nationwide Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

139.    Plaintiffs and Nationwide Class Members seek all damages, restitution, attorneys' fees, costs of suit and/or injunctive relief.

**COUNT IV**
**N.Y. GEN. BUS. LAW § 350**
**(Plaintiffs Against All Defendants)**

140.    Plaintiffs repeat and re-allege all allegations in the foregoing paragraphs 1 to 95 as if fully set forth herein.

141.    Plaintiffs assert Count IV on behalf of the Nationwide Class against all Defendants.

142.    Under N.Y. GBL § 350 "false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

143.    Under N.Y. GBL § 350-a, "false advertising' means advertising, including labeling, of a commodity or service that is misleading in a material respect.

144.    Defendant engaged in a widespread public advertising campaign through social media, television, and digital platforms that was deceptive or misleading in material respects, including but not limited to:

- Advertising that "gambling is legal in all 50 states" when it offers unlicensed sports wagers under New York law.

- Promoting the platform as a "safe" and "regulated" exchange, while omitting the fact that it operates as an unlicensed gambling enterprise.

- Falsely advertising the platform as "peer-to-peer" to suggest a fair market, while concealing that users were frequently matched against Defendants' own internal (and partner) market makers.

145.    Defendants' advertisements failed to reveal that the sports "prediction markets" offered are functionally identical to sports betting and carry the same risks of addiction and financial loss associated with unregulated gambling.

146.    Defendants' advertisements were consumer-oriented and were likely to mislead a reasonable consumer acting reasonably under the circumstances into believing they were participating in a lawful, peer-to-peer financial exchange rather than an unlicensed sportsbook.

147.    As a direct and proximate result of Defendants' false advertising, Plaintiff and the Nationwide Class Members were induced to deposit and lose money on a platform they would not have used had the true nature of the service been disclosed, and they will continue to suffer injury.

148.    Under N.Y. GBL § 350-e(3), Plaintiff and the Nationwide Class Members are entitled to recover their actual damages or five hundred dollars ($500), whichever is greater.

149.    Because Defendants willfully and knowingly violated this section, the Court should exercise its discretion to increase the award of damages to three times the actual damages (up to $10,000 per person) and award reasonable attorney's fees.

150.    Accordingly, Plaintiffs and the Nationwide Class Members seek all damages, restitution, attorneys' fees, costs of suit and/or injunctive relief.

### COUNT V
### UNJUST ENRICHMENT
### (Plaintiffs Against All Defendants)

151.    Plaintiffs repeat and re-allege all allegations in the foregoing paragraphs 1 to 95 as if fully set forth herein.

152.    Plaintiffs assert Count V on behalf of the Nationwide Class against all Defendants.

153.    Defendant's Member Agreement and Rulebook specify that any action brought against Kalshi by any participant (*e.g.*, user) is governed by New York law "without regard to statutes, precedent, legal doctrine, or contractual provisions that would require the application of the laws of a different jurisdiction."

154.    Plaintiffs and the Nationwide Class Members conferred benefit upon Defendant by depositing money and purchasing illegal sports wagers on or through Defendant's trading platform.

155.    Defendant appreciated or had knowledge such benefits.

156.    Plaintiffs and the Nationwide Class Members reasonably understood that Defendant offered lawful consumer-to-consumer markets under New York law.

157.    Defendants have been unjustly enriched by retaining money derived from Plaintiffs' and the Nationwide Class Members' purchase of sports bets, saving the costs they reasonably should have expended on complying with regulations and tax requirements for offering betting and wagering services that were not properly advertised or permitted by law.

158.    Defendants misrepresented that Kalshi was legal and profited off that misrepresentation.

159.    Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and the Nationwide Class Members' benefits conferred.

160.    Plaintiffs and the Nationwide Class Members have no adequate remedy at law.

161.    Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and the Nationwide Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

162.    Kalshi has, in the course of business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices by tricking consumers into believing

the operation of its gambling website is lawful in New York and other states, when it is not, and has further tricked consumers into believing they are not gambling against the House, causing Plaintiffs and the Nationwide Class Members to be tricked out of millions of dollars.

163.    Plaintiffs and the Nationwide Class Members have a right to recover from Kalshi the monies deposited as part of Kalshi's unlawful betting and/or wagering enterprise.

164.    Accordingly, Plaintiffs and the Nationwide Class seek all damages, restitution, attorneys' fees, costs of suit and/or injunctive relief.

**COUNT VI**
**GEORGIA O.C.G.A. § 13-8-3 ("O.C.G.A")**
**(on behalf of Plaintiff Gutta and the Georgia Class Against All Defendants)**

165.    Plaintiffs repeat and re-allege all allegations in the foregoing paragraphs 1 to 95 as if fully set forth herein.

166.    Plaintiffs assert Count VI on behalf of the Georgia Class.

167.    Plaintiffs bring this count against all Defendants under O.C.G.A § 13-8-3.

168.    Kalshi and Plaintiffs are "persons" within the meaning of the O.C.G.A.

169.    Under O.C.G.A §§ 13-8-3(a) and (b) all "gambling contracts are void" and "money paid or property delivered upon a gambling consideration may be recovered from the winner by the loser by institution of an action for the same within six months after the loss…"

170.    Every trade placed by the Georgia Class on Defendants' platform constitutes a "gambling contract" because the return is contingent upon the outcome of an uncertain event (a sports contest) in which the parties have no interest other than the wager itself.

171.    O.C.G.A. § 16-12-21 prohibits the operation of a "gambling place" or "commercial gambling."

172.    Defendants are not licensed to conduct gaming in Georgia.

173.    Kalshi is the "winner" as defined by § 13-8-3.

174.    Plaintiff and the Georgia Class have lost money to the winner within the last six months and are entitled to the return of such funds.

175.    Plaintiffs have the right to recover money paid to Kalshi, for its unlawful betting or wagering enterprise.

176.    Accordingly, Plaintiffs and the Georgia Class seek all damages, restitution, attorneys' fees, costs of suit and/or injunctive relief.

**COUNT VII**
**VIOLATION OF TENN. CODE. ANN. ("TC") § 28-3-106**
**(on behalf of Plaintiff Kravetz and the Tennessee Class Against All Defendants)**

177.    Plaintiffs repeat and re-allege all allegations in the foregoing paragraphs 1 to 95 as if fully set forth herein.

178.    Plaintiffs assert Count VII on behalf of the Tennessee Class.

179.    Plaintiffs bring this count against all Defendants under Tenn. Code. Ann. 28-3-106.

180.    Kalshi and Plaintiffs are "persons" within the meaning of the TC.

181.    Under TC § 39-17-501(2), "gambling" is defined as risking anything of value for a profit whose return is to any degree contingent on chance.

182.    Gambling is contrary to the public policy of the State of Tennessee.

183.    The Tennessee Sports Wagering Council (SWC) requires all sports wagering operators to be licensed under the Tennessee Sports Gaming Act. Defendants are not now, nor have they ever been, licensed by the SWC.

184.    In April 2025, the SWC formally declared that "sports event contracts" of the type offered by Defendants constitute unlicensed wagering in violation of Tennessee law.

185.    Under Tenn. Code Ann. § 28-3-106(1), any "loser" of money or goods at "any kind of gambling or betting" may bring an action to recover such money or goods.

186.    Plaintiff and the Tennessee Class Members have brought this action within ninety (90) days of the payment or delivery of the funds lost to Defendants, as required by the statute to preserve their individual rights as "losers."

187.    Plaintiff suffered "economic loss" by placing bets and/or wagers from a Tennessee in violation of TC § 28-3-106.

188.    Plaintiff lost money placing wagers and/or bets on Kalshi directly and through Robinhood facilitated by Kalshi on the Kalshi exchange.

189.    Plaintiffs have the right to recover money paid to Kalshi, for its unlawful betting or wagering enterprise.

190.    Accordingly, Plaintiffs and the Tennessee Class seek all damages, restitution, attorneys' fees, costs of suit and/or injunctive relief.

## <u>COUNT VIII</u>
### VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200, ET SEQ.
### (on behalf of Plaintiff Nathaniel Bee and the California Class Against All Defendants)

191.    Plaintiffs repeat and re-allege all allegations in the foregoing paragraphs 1 to 95 as if fully set forth herein.

192.    Plaintiffs assert Count VIII on behalf of the California Class.

193.    Plaintiffs bring this count against all Defendants under Cal. Bus. & Prof. Code §§ 17200, *et seq.* (the "UCL"), which prohibits any "unlawful, unfair or fraudulent business act or practice."

194.    Kalshi and Plaintiffs are "persons" within the meaning of the UCL.

195.    Under the "unlawful" prong of the UCL, a business practice is actionable if it violates any other law. Defendant has violated the UCL by virtue of their violations of, *inter alia*, Cal. Penal Code §§ 330, 337a, and 337j.

196.    Every trade placed by the California Class on Defendant's platform constitutes an "unlawful" act because the platform operates as an unlicensed gambling enterprise. Under Cal. Penal Code § 337a, receiving or holding money wagered upon the result of a contingent event or sports contest is prohibited.

197.    Under Cal. Bus. & Prof. Code § 19801, no person has a right to operate a gambling enterprise in California except as expressly permitted by state law. Kalshi has not applied for, nor obtained, a valid state gambling license.

198.    Kalshi further engages in "unfair" and "fraudulent" practices by misrepresenting its platform as a peer-to-peer financial exchange while matching consumers against Defendant's own internal market-making affiliates in a "banking game" prohibited by Cal. Penal Code § 330. Kalshi has deceived consumers into thinking its sports betting is lawful in California, when it is illegal and unlicensed sports gambling.

199.    Kalshi is the recipient of funds derived from these unlawful and unfair business practices.

200.    Plaintiff and the California Class have suffered injury in the form of lost money and property as a direct and proximate result of Defendant's UCL violations, in that they would not have deposited or lost funds on the platform but for Defendant's misrepresentations regarding the legality and nature of their wagering products.

201.    Under Cal. Bus. & Prof. Code § 17203, Plaintiffs and the Class have the right to all forms of relief, including restitution and/or disgorgement of all monies acquired by Kalshi through its unlawful and unfair betting or wagering enterprise, as well as attorney's fees and costs.

### COUNT IX
### MINNESOTA STAT. § 541.20
### (on behalf of Plaintiff Hallman and the Minnesota Class Against All Defendants)

202.    Plaintiffs repeat and re-allege all allegations in the foregoing paragraphs 1 to 95 as if fully set forth herein.

203.    Plaintiffs assert Count IX on behalf of the Minnesota Class.

204.    Plaintiffs bring this count against all Defendants under Minn. Stat. § 541.20.

205.    Kalshi and Plaintiffs are "persons" within the meaning of the Minn. Stat.

206.    Minn. Stat. § 541.20 provides that, "Every person who … by betting on the hands or sides of such as are gambling, shall lose to any person so playing or betting any sum of money or any goods, and pays or delivers the same, or any part thereof, to the winner, may sue for and recover such money by a civil action, before any court of competent jurisdiction."

207.    Defendant engaged in gambling under § 541.20 by conducting business without a license or gambling authorized under chapters 349 and 349A. Minn. Stat. § 541.20.

208.    Plaintiff and the Minnesota Class lost money placing wagers and/or bets on Kalshi directly or through Robinhood facilitated by Kalshi on the Kalshi exchange.

209.    Kalshi is a gambling "winner" under Minn. Stat. § 541.20.

210.    Plaintiffs have the right to recover money paid to Kalshi, for its unlawful betting or wagering enterprise.

211.    Accordingly, Plaintiffs and the Minnesota Class seek all damages, restitution, attorneys' fees, costs of suit and/or injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment on behalf of themselves and members of the Class and Subclasses as follows:

A.    For an order certifying the Class and Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Subclass and Plaintiffs' attorneys as Class Counsel;

B.     For an order declaring that Defendant's conduct violates the statutes referenced herein;

C.     For an order finding in favor of Plaintiffs and the Class and/or Subclasses on all counts asserted herein;

D.     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.     For injunctive relief enjoining the illegal acts detailed herein;

F.     For prejudgment interest on all amounts awarded;

G.     For an order of restitution and all other forms of equitable monetary relief;

H.     For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

### JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  January 13, 2026.                    Respectfully submitted,


By:     /s/ *Aaron Schwartz*


**KAPLAN FOX & KILSHEIMER LLP**
Aaron Schwartz
Clara P. Abramson
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: (212) 687-1980
*ASchwartz@kaplanfox.com*
*CAbramson@kaplanfox.com*

Laurence D. King
Matthew George (*pro hac vice* to be filed)
1999 Harrison Street, Suite 1501
Oakland, CA  94612
Telephone: (415) 772-4700
*LKing@kaplanfox.com*
*MGeorge@kaplanfox.com*

*Attorneys for Plaintiff(s) and the Proposed Class*